JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-00090 RGK (JWJx) | Date | April 22, 2010 |
|---|---|---|---|
| Title | VARTAN MINASSIAN v. AIG LIFE INSURANCE COMPANY AND AUTONATION LONG TERM DISABILITY PLAN | | |

| Present: The Honorable | R. GARY KLAUSNER, U.S. DISTRICT JUDGE | | |
|---|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: | |
| Not Present | | Not Present | |

**Proceedings:**     **(IN CHAMBERS)** Order and Judgment Re Court Trial

## I.     INTRODUCTION

Vartan Minassian ("Plaintiff") has sued AIG Life Insurance Company ("AIG") and AutoNation Long Term Disability Plan ("Plan") (collectively, "Defendants") for Breach of Plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff seeks declaratory and injunctive relief, and recovery of plan benefits. Plaintiff's action arises out of Defendants' denial of his claim for long-term disability ("LTD") benefits under the Plan. The parties have submitted their trial briefs to the Court for a bench trial. For the following reasons, the Court grants judgment in favor of Defendants.

## II.     JUDICIAL STANDARD

A determination that denies benefits under an ERISA plan is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).The parties to this action have stipulated that the de novo standard of review applies to AIG's claim decision.

When a de novo standard of review applies, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits . . . ." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). In doing so, the district court can review evidence extrinsic to the administrative record. *Id.* at 970.

## III.     RELEVANT PLAN PROVISIONS

Under the Plan, LTD benefits are available to eligible employees who (1) become Disabled

while insured under the Policy; (2) are Disabled throughout the Elimination Period; (3) remain Disabled beyond the Elimination Period; (4) are, and have been, under the Regular Care of a Physician[1] during the Elimination Period; (5) report and file a claim within the required time frame; and (6) submit satisfactory proof of loss. (Administrative Record ("AR") 0046.)

The Elimination Period is the latter of (1) the first 26 consecutive weeks of any one period of Disability; or (2) the expiration of any Employer sponsored short term disability benefits program.[2] (AR 0037.) The Plan defines Disabled as Totally or Residually Disabled. Totally Disabled means that, during the Elimination Period, and for the next 12 months, the employee cannot perform the essential duties of his regular occupation[3] due to, among other things, accidental bodily injury or sickness. After such time, the employee must be prevented from performing the essential duties of any occupation for which he is qualified by education, training, or experience. (AR 0042.) Residually Disabled means the employee cannot perform some, but not all, of the essential duties of his or any occupation due to, among other things, accidental bodily injury or sickness. And, as a result, the employee's Current Monthly Earnings are at least 20%, but no more than 80% of his Pre-disability Earnings, as appropriately adjusted. (AR 0041.)

Under the Plan, an employee is eligible for LTD benefits only if he is an active, full-time, retail employee. (AR 0037.) The Plan defines full-time employment as 30 hours per week or more. *Id*. Moreover, the employee must have contributed to the Plan's cost. *Id*.

## IV.    FINDINGS OF FACT

AIG issued Group Long Term Disability Insurance Policy No. 51605 ("Policy") to AutoNation, Inc. ("AutoNation"), with an effective date of April 1, 2002. AutoNation provides LTD insurance coverage to its full-time employees through the Plan. The Plan is an employee benefit plan within the meaning of ERISA.

Beginning March 9, 1999 through January 2, 2003, Plaintiff was employed by AutoNation as a car salesman.[4] From the time the LTD Policy became effective in April 2002, Plaintiff, as an active, full-time retail employee, periodically contributed to the Plan's cost. (AR 0291-0313.)

The injuries for which Plaintiff claims LTD benefits arose out of an August 17, 2002 accident, in which Plaintiff fell out of a broken chair in the lunchroom. (AR 0632.) Plaintiff contends that he became disabled as a result of injuries sustained to his shoulder, lower back, and neck. *Id*.

Following the accident, Plaintiff sought medical care for his injuries. (*See* Pl.'s Reply, Ex. 8 at pp.12-19.) Initially, Dr. Robert Kubin treated Plaintiff for neck and back pain, and prescribed physical

---

[1] Regular Care of a Physician means appropriate care and attendance by a properly licensed practitioner who is not the Associate or a member of his immediate family. (AR 0041.)

[2] Benefits required by State law are excluded from consideration. (AR 0037.)

[3] The Plan's meaning of Occupation is the occupation as it is recognized in the general workplace, not the specific job an employee performs for a specific employer, or at a specific location. (AR 0042.)

[4] Plaintiff worked specifically at Hayward Dodge, which at all relevant times was a member of AutoNation. For purposes of this order, the Court will refer to Plaintiff's employer as AutoNation.

therapy and medication. (Pl.'s Reply, Ex. 8 at p.14.) Plaintiff continued working. (AR 0380.) On December 11, 2002, Plaintiff was notified that his November sales production did not reach the minimum acceptable level. (Pl.'s Reply, Ex. 10.) On the same day, Plaintiff requested a 21 day vacation, from December 26, 2002 to January 17, 2003, which was approved. (AR 0220.)

On December 16, 2002, Plaintiff saw Dr. Paul Hughes, an orthopedist. Dr. Hughes noted that Plaintiff still had some residual problems in his lower lumbar spine due to his injury. (AR 0535.) He ordered continued physical therapy and medication, as well as modified work duty, with a six hour limit per day, for a duration of four weeks. (AR 0534-0535.)

On December 31, 2002, while Plaintiff was on vacation, AutoNation terminated Plaintiff's employment, effective January 2, 2003. (AR 0218.) The stated reason was reduction of sales force. (AR 0219.) According to the Administrative Record, Plaintiff worked an average of 50 hours per week until his termination date, which he listed as December 30, 2002. (AR 0618.)

In January 2003, Plaintiff saw Dr. Dirk Baumann for a three to four month history of mild bilateral low extremity claudication, and a three day history of severe left calf claudication. (Pl.'s Reply, Ex. 8 at p. 14.) On March 5, 2003, Plaintiff underwent surgery to treat the condition. (AR 0506.) Plaintiff was discharged from the hospital on March 8, 2003. *Id*. According to the Discharge Summary, Plaintiff was ambulating well and told to elevate his leg as much as possible. *Id*. On June 3, 2003, Dr. Kubin certified that Plaintiff was disabled from his regular and customary work because sitting or standing caused swelling in Plaintiff's left leg. (AR 0478.) Dr. Kubin estimated that Plaintiff could return to his regular and customary work on July 3, 2003. *Id*.

Prior to the surgery on Plaintiff's leg, in February 2003, Plaintiff was diagnosed with right shoulder rotator cuff tendonitis. (AR 0380.) On April 14, 2003, Dr. Hughes diagnosed Plaintiff with a rotator cuff tear and cervical and lumbar degenerative disc disease. (AR 0481.) Dr. Hughes recommended modified work duty with the restriction of no lifting, pulling, or reaching, and minimal use of the right arm. *Id*. He estimated that Plaintiff would be able to return to full duty in six weeks. *Id*. On May 29, 2003 Dr. Hughes stated that Plaintiff's condition had not improved, and restricted Plaintiff from lifting and reaching. (AR 0533.) On July 14, 2003, Dr. Hughes stated that Plaintiff's right shoulder condition had improved as expected, and ordered continued physical therapy and modified work duty with the restriction of no lifting or reaching. (AR 0532.) On August 25, 2003, Dr. Hughes continued Plaintiff on modified work duty, restricting him from lifting and reaching. (AR 0526.)

In October 21, 2003, Plaintiff underwent surgery to repair his right rotator cuff. (AR 0569-0572.) On November 10, 2003, Dr. Hughes indicated that Plaintiff had improved as expected. (AR 0522.) Dr. Hughes ordered continued physical therapy and estimated that Plaintiff would be able to return to work in full capacity within 12 to 16 weeks. *Id*.

On November 19, 2003, upon request, Dr Hughes provided a summary of treatment. (AR 0546.) In his summary, Dr. Hughes described the treatment and prognosis for recovery for Plaintiff's rotator cuff tear. *Id*. Dr. Hughes also stated that "it is very much possible the tear and aggravation of this occurred at the time of his injury on August 17, 2002." *Id*. On December 2, 2004, Dr. Hughes completed a Physical Capacities Assessment of Plaintiff. (AR 0575-0577.) According to the assessment, (1) in an eight-hour work day, Plaintiff could occasionally lift/carry up to 10 pounds, sit for one hour, stand for two hours, and walk for three hours; (2) Plaintiff could never reach (extend hands and arms in any direction); (3) Plaintiff could not simple grasp, firm grasp, or fine manipulate with the right hand; and (4) Plaintiff was restricted from long driving. *Id*. Additionally, Dr. Hughes stated that Plaintiff restrictions were permanent, and prevented Plaintiff from returning to his former occupation full-time.

(AR 0576.) In a December 15, 2003 letter relating to Plaintiff's Worker's Compensation claim, Dr. Hughes again stated that the rotator cuff tear was a result of the August 17 accident. (AR 0543.) On the same date, Dr. Hughes filled out a Physician's Report that restricted Plaintiff to no work for four weeks. (AR 0519.) On January 12, 2004, Dr. Hughes reported that Plaintiff's condition had improved, but slower than expected. (AR 0517.) He restricted Plaintiff to modified work, with no lifting more than 20 pounds, and no pushing, pulling, and reaching. *Id*.

On January 28, 2004, Dr. John Warbritton, an orthopedist, examined Plaintiff as part of the Agreed Medical Examination relating to Plaintiff's Worker's Compensation claim. (AR 0366.) In his February 28, 2004 report, Dr. Warbritton stated, in pertinent part, the following: (1) Plaintiff suffers from a cervical and lumbar spine condition that precludes him from heavy lifting, prolonged or continuous forward flexion or extension of the neck, and from repetitive twisting movements of the neck; (2) Plaintiff's cervical spine and back condition is related to the August 17 industrial accident; (3) Plaintiff developed peripheral vascular disease requiring surgery, which was related to hypertension and diabetes; (4) Plaintiff's rotator cuff injury has resulted in dramatic limitation of motion in the right shoulder leaving him temporarily totally disabled; (5) after Plaintiff's injury reaches permanent and stationary status,[5] Plaintiff will probably be precluded from performing overhead work with the right dominant arm, as well as forceful pushing and pulling activities at or above the shoulder level; and (6) there is insufficient evidence to support Plaintiff's and Dr. Hughes's assertions that the rotator cuff tear was related to the August 17 accident. (AR 0375-0384.)

On March 8, April 19, June 2, and August 9, 2004, according to Dr. Hughes's Attending Physician Reports, Plaintiff's right shoulder condition went from improving as expected, to worsening, to improving slower than expected. (AR 0515, 0514, 0511 and 00438.) During this time, Dr. Hughes gave work limitations of no lifting more than 10 to 20 pounds, no pushing, pulling or reaching, and minimal use of the right arm. *Id*.

On November 8, 2004, Plaintiff filed a claim for LTD benefits under the Plan. (AR 0613-0618.) On the form, Plaintiff asserts as the basis for his disability his lower back and neck pain, and his inability to use his right hand. (AR 0613.) By letter dated April 11, 2005, AIG denied Plaintiff's claim based on insufficient documentation from AutoNation that would allow AIG to determine Plaintiff's eligibility. (AR 0319-0312.)

Plaintiff submitted a handwritten appeal letter dated May 4, 2005. Dr. William Simonet, an orthopedist, conducted a file review and peer consultation, and reported his findings by letter dated January 10, 2006. (AR 0156-0163.) Dr. Simonet found that the clinical documentation did not support a disabling condition beyond July 1, 2003. *Id*. Additionally, the file provided to AIG did not provide any documentation showing the effective date of Plaintiff's LTD coverage. *Id*. AIG sent a January 18, 2006 letter to Plaintiff stating that AIG had completed the appeal and upheld the previous decision denying the claim on the following grounds: (1) Plaintiff did not meet the definition of Total Disability as defined by the Policy, and (2) AIG was unable to verify Plaintiff's eligibility for benefits through AutoNation. (AR 0143-0151.)

On June 9, 2006, Plaintiff filed another appeal, which prompted an additional review. (AR 0193.) Dr. Thomas Reeder, an internist, and Ruby MacDonald, a vocational consultant, reviewed the claim file. According to Dr. Reeder and Ms. MacDonald, Plaintiff's reasonable restrictions and

---

[5] "'Permanent and stationary status' is the point when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." Cal. Code. Regs. § 9785(a)(8).

limitations due to his back injury did not, and should not, impair his ability to perform the duties of his occupation. (AR 0100.) Restrictions and limitations due to the vascular disease, which did impair Plaintiff's ability to perform his job, would be supported only until April 4, 2003, which is prior to the end of the Elimination Period. *Id*. Finally, Dr. Reeder and Ms. MacDonald concluded that Plaintiff's restrictions due to his pre-surgery shoulder condition would not prevent Plaintiff from performing the duties of a car salesman.[6] *Id*. By letter dated October 9, 2006, AIG[7] concluded that Plaintiff's claim had been properly denied because he failed to satisfy the Plan's definition of Total Disability. (AR 0098-0100.) The letter also informed Plaintiff that he had exhausted his administrative remedies and had the right to sue for benefits under ERISA. *Id*.

## V. CONCLUSIONS OF LAW

The Plan states that a qualified employee is eligible for LTD benefits only if he (1) becomes Disabled while insured under the Policy; (2) is Disabled throughout the Elimination Period; (3) remains Disabled beyond the Elimination Period; (4) is, and has been, under the Regular Care of a Physician during the Elimination Period; (5) reports and files a claim within the required time frame; and (6) submits satisfactory proof of loss. (AR 0046.)

To be considered "Disabled," Plaintiff must show that he is Totally Disabled.[8] As such, Plaintiff must show that, for 26 consecutive weeks[9] and the subsequent 12 months, Plaintiff could not perform the essential duties of his regular occupation due to his injuries. (AR 0037 and 0042.) Plaintiff must then show that, after that period of time, his injuries prevented him from performing the essential duties of any occupation for which he is qualified by education, training, or experience. (AR 0042.)

The Dictionary of Occupational Titles' provides the following occupational description of an automobile salesman: (1) light occupation requiring occasional lifting, carrying, pushing and pulling of 20 pounds, frequently up to 10 pounds, or negligible amounts constantly; (2) can include walking and/or standing frequently, even though weight is negligible; (3) can include pushing and/or pulling of arm and or leg controls. (AR 0135 and 0153.) Physical demands are as follows: (1) frequent reaching, handling, talking, hearing, near and far acuity, and (2) occasional fingering, depth perception, accommodation, color vision, and field of vision. *Id*.

---

[6] The letter noted that AIG did not consider the period of impairment following the rotator cuff surgery because Plaintiff was no longer in an eligible class, as he was no longer a covered employee of AutoNation. (AR 0100.)

[7] Effective April 1, 2006, AIG transferred its administrative responsibilities to Disability RMS. Plaintiff received a letter dated July 27, 2006, informing him that, while AIG was still the insurer of the Policy, his claim would be handled by Disability RMS. The October 9, 2006 letter was sent by Disability RMS. However, for purposes of this decision, the Court will deem action taken by Disability RMS as action taken by AIG.

[8] Under the Policy, Disabled means either Totally Disabled or Residually Disabled. Plaintiff does not appear to argue that he was Residually Disabled. Furthermore, there is no evidence either set forth by Plaintiff or contained in the Administrative Record that addresses the Residual Disability requirement.

[9] There appears to be no dispute that the applicable period is 26 consecutive weeks, as opposed to a period defined by the expiration of an employer sponsored short term disability benefits program.

Defendants contend that AIG's denial of Plaintiff's LTD disability claim was proper because, among other things, Plaintiff cannot prove that he was Disabled prior to his termination on January 2, 2003. For the following reasons, the Court finds that AIG's denial was proper.[10]

According to the Record, from the date of the accident through the denial of Plaintiff's LTD claim, Plaintiff suffered from three physical conditions causing limitations: (1) back and neck injury; (2) left leg claudication; and (3) right rotator cuff injury. Plaintiff argues that each of these conditions provides a basis for LTD benefits. The Court addresses each condition in turn.

### A.     **Back and Neck Injury**

The parties do not dispute that Plaintiff suffered injury to his back and neck as a result of the August 17, 2002 accident. The evidence indicates that immediately after the accident, and for the next four months, Plaintiff continued to perform his regular job duties. (*See* AR 380.) In fact, it appears that his job performance remained unchanged until November 2002. (*See* Pl.'s Reply, Ex. 10.) It was not until mid-December when Plaintiff's orthopedist placed him on modified work duty. (AR 0534-0535.) Even then, Plaintiff was restricted only to 6 hours a day, with no physical restrictions. *Id*. Based on a five day work week, Plaintiff was still considered a full-time employee, which the Plan defines as 30 hours per week. (*See* AR 0037.) There is no evidence showing that Plaintiff worked less than 30 hours per week in the last half of December 2002 before Plaintiff's employment was terminated. (*See* AR 0618.)

Thereafter, no other restrictions relating to Plaintiff's neck and back condition are mentioned in the Administrative Record until Dr. Warbritton's February 28, 2004 Report. In that report, Dr. Warbritton states that Plaintiff's conditions precludes him from the following: (1) heavy lifting, (2) prolonged or continuous forward flexion or extension of the neck, and (3) repetitive twisting movements with the neck. (AR 0382.) These restrictions were found not to prevent Plaintiff from performing the duties of a car salesman. (AR 0100.) Based on the description provided by the Dictionary of Occupational Titles, the Court finds this assessment reasonable. Therefore, based on the evidence presented, it does not appear that Plaintiff's back and neck injuries resulting from the accident ever prevented Plaintiff from performing the essential duties of his regular occupation.

### B.     **Left Leg Claudication**

After AutoNation terminated Plaintiff's employment, Plaintiff developed severe left calf claudication, which was treated by surgery on March 5, 2003. (AR 0506.) The evidence indicates that the condition may have started developing while Plaintiff was still employed. (*See* Pl.'s Reply, Ex. 8 at p. 14.) However, there is absolutely no evidence relating this condition to the August 17, 2002 accident. To the contrary, physician reviews and Plaintiff's own treating physicians indicate that the condition was a result of Plaintiff's hypertension and diabetes. (*See* AR 0375 - 0384, Pl.'s Reply, Ex. 8 at p. 15.)

Moreover, Plaintiff's treating physician, who certified that Plaintiff could not work as a result of swelling in his left leg, estimated that Plaintiff could return to his regular and customary work on July 3, 2003. (AR 0478.) Plaintiff has not pointed to evidence indicating that any disability resulting from the leg condition continued after that date. Therefore, even if the left leg claudication resulted from the

---

[10] Defendants also argue that AIG properly denied the claim because it had not been timely filed. However, based on the Court's findings below, it need not address this argument.

accident, Plaintiff would not have satisfied the required time period for Total Disability, which is the Elimination Period plus 12 additional months.[11]

### C. Right Rotator Cuff

The Administrative Record indicates that Plaintiff's right rotator cuff injury first presented in February 2003. (AR 0380.) The Record also shows that Plaintiff has been consistently restricted from lifting, pulling, reaching, and more than minimal use of the right hand due to this injury. (AR 0481, 0533, 0532, 0526, 0575-0577, 0519, 0517 0515, 0514, 0511, 0438.) In his February 28, 2004 report, Dr. Warbritton even states that Plaintiff, at the time of examination, was temporarily totally disabled because of his condition. (AR 0375-0384.) However, for the following reasons, the Court finds that the injury was not a result of the August 17, 2002 accident, and occurred after Plaintiff was terminated from his employment with AutoNation and no longer eligible for benefits under the Plan.

Plaintiff's treating physician, Dr. Hughes, stated on two different occasions that Plaintiff's rotator cuff injury was likely a result of the August 17, 2002 accident. (*See* AR 0546 and 0543.) However, as pointed out by defense-retained physicians, Dr. Hughes never provided objective evidence, or "logical or legally tenable explanation" supporting his statement. (AR 0383.) In the opinion of Dr. Warbritton, the contemporaneous medical evidence was not supportive of a right rotator cuff injury. *Id*. Of significant note is the fact that the Record contains no evidence of any complaint by Plaintiff of right shoulder problems until nearly six months after the accident. In light of these facts, the Court finds that Plaintiff has not meet his burden of proof in showing that he was eligible for LTD benefits due to this injury.

For the reasons stated above, the Court **ENTERS JUDGMENT IN FAVOR OF DEFENDANT**.

**IT IS SO ORDERED.**

|  | : |  |
|---|---|---|
| Initials of Preparer | | slw |

---

[11] Assuming that August 17, 2002 marks the beginning of a disability, Plaintiff would have to show that the disability lasted until the end of February 2004.